**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **WILLIAM BROWN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 24 C 8885** |
| | ) | |
| **THOMAS DART. et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

MATTHEW F. KENNELLY, District Judge:

William Brown has sued Thomas Dart, in his individual and official capacity as

Cook County Sheriff, for injuries Brown suffered from altercations with other inmates

while he was a pretrial detainee at Cook County Jail.[1]  Brown seeks to hold Dart liable

under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658

(1978), alleging that his injuries were caused by inadequate inmate-supervision

practices in violation of the Fourteenth Amendment.

Dart has filed a motion for partial summary judgment.  For the reasons below, the

Court grants Dart's motion.

**Background**

At all relevant times, Brown was a pretrial detainee in Cook County Jail, which

divides the inmate population into different housing units called "tiers."  His claims arise

---

[1] Brown has also named Cook County as a defendant because it is responsible for
indemnification under Illinois law and is therefore an indispensable party.  *See Carver v.
Sheriff of LaSalle Cnty.*, 324 F.3d 947, 948 (7th Cir. 2003); Fed. R. Civ. P. 19.

out of two physical altercations he had with other inmates, both of which were recorded at least partially by surveillance cameras.

The first occurred on January 19, 2023, when Correctional Officer Carlos Castillo was assigned to supervise Brown's tier. The camera footage shows that while Castillo performed cell checks, the inmates in the tier congregated in a public area. Castillo then left the tier to assist his partner with letting out detainees in another tier. Brown testified in his deposition that Castillo announced that he was going to "cross-watch"—a term that refers to a single officer supervising multiple tiers simultaneously. In Castillo's deposition, he denied making such an announcement.

Approximately four minutes later, Brown and another detainee in the public area exchanged words, then got into a fight. The fight ended after roughly forty seconds, when several other inmates broke them up. Brown alleges that he suffered a broken finger in the process. Castillo returned to the tier eleven minutes later, about fifteen minutes after he had left. According to Brown, his assailant had threatened him earlier in the morning, but he did not report those threats to the jail staff before the fight.

The second physical altercation occurred on May 27, 2023. Correctional Officer Cobarii Corbert was assigned to supervise Brown's tier. The camera footage depicts her supervising the inmates in a public area from an "officer bubble," a small room from which an officer can see into a tier through a translucent barrier. At some point, Corbert leaves the view of the camera and can no longer be seen inside the bubble.

Roughly 15 seconds after Corbert left, Brown and another detainee had a brief conversation in the corner of the tier, near a public microwave. According to Brown, he was using the microwave to heat up his food when the other detainee unplugged it to

2

plug in a radio instead.  The other detainee then entered a nearby shower area, outside of the camera's view.  When Brown returned to the microwave, the other detainee came out of the shower area, struck Brown in the back of the head, then ran back inside. Brown followed and, according to him, was beaten by several others in the shower area. Though that area is outside the view of the cameras, it is apparent from the footage that Brown got into an altercation with several inmates, who at one point dragged him back into the shower area when he tried to crawl out.  Brown alleges that by the end of the altercation, he was bleeding and one of his eyes was swollen shut.

The camera footage shows that Corbert returned to the bubble at the tail end of the altercation.  She was absent for a total of approximately one minute and thirty-eight seconds.

On September 25, 2024, Brown filed this suit asserting a *Monell* claim against Dart for violation of his Fourteenth Amendment rights and seeking indemnification from Cook County.  In his complaint, Brown alleged that his injuries were caused by an express policy permitting the "inherently dangerous" practice of cross-watching in response to understaffing at Cook County jail.  *See* Compl. ¶ 90.  In the alternative, Brown alleged that Dart condoned a "widespread custom or practice of cross-watching that is so pervasive that it . . . constitutes a policy decision."  *Id.* ¶ 97.  According to Brown, Dart knew of the risks of such a practice because insufficient staffing has led to frequent inmate injuries.

Dart has moved for partial summary judgment seeking dismissal of Brown's *Monell* claim.  At this stage, the parties agree that Castillo and Corbert were not assigned to monitor any other tiers at the time of the incidents.  *See* Pl.'s Resp. to Def.'s

3

Stat. of Facts ¶¶ 22, 39; Pl.'s Opp'n to Mot. for Summ. J. at 6–7.  Brown instead asserts that the prison has a policy or practice of permitting supervising guards to leave their assigned tier to help in another tier.  This "assistance practice," he claims, is "the functional equivalent of cross-watching."  Pl.'s Opp'n to Mot. for Summ. J. at 6.  The bottom line, according to Brown, is that "jails cannot leave pre-trial detainees unsupervised for unreasonable periods of time," whether those "critical security gaps" are from cross-watching, an "assistance practice," or some other alleged inadequacy in the prison's policy and training.  *See id.* at 1, 6–7; *id.* at 15–16 (questioning "staff utilization" at the prison).

To this point, Brown has also filed a motion under Rule 56(d) asserting that he has not yet had an adequate opportunity for discovery to oppose summary judgment. He requests discovery concerning other instances of inmate violence and injuries, policies and training regarding inmate supervision, records and reported concerns about staffing levels, and a deposition of the Sheriff's Department.  According to Brown, this evidence will show that his assaults were not isolated incidents, but rather part of a larger pattern of inmate injuries caused by prison policy or practices that permit an objectively unreasonable gap in prisoner supervision.

The Court asked Brown to incorporate his Rule 56(d) arguments and requests into his response to Dart's summary judgment motion.

### Discussion

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Those conditions are satisfied when a factfinder

4

could not reasonably find in the nonmovant's favor based on the evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986).

Summary judgment is inappropriate, however, if the nonmovant has not yet had an "adequate" opportunity for discovery to oppose the motion. *Berk v. Choy*, 146 S. Ct. 546, 555 (2026) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *see Grayson v. O'Neill*, 308 F.3d 808, 815 (7th Cir. 2002). Rule 56(d) thus provides that if the nonmovant "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d).

Brown's claim is based on 42 U.S.C. § 1983, which authorizes private parties to sue any "person" acting under color of state law who violates their "rights, privileges, or immunities secured by the Constitution and [federal] laws." 42 U.S.C. § 1983; *see Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 365 (2025). "Incarcerated people have a clearly established right to be free from physical harm inflicted by others in the institution." *Kemp v. Fulton County*, 27 F.4th 491, 494 (7th Cir. 2022). "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

But not every harm caused by another inmate "translates into constitutional liability for prison officials responsible for the victim's safety." *Id.* A convicted inmate, whose claim arises under the Eighth Amendment's prohibition on cruel and unusual punishment, must show that the defendant was subjectively aware of, and indifferent to, a "substantial risk of serious harm." *Id.* at 837; *see Miranda v. County of Lake*, 900 F.3d

5

335, 350 (7th Cir. 2018). Because Brown was a pretrial detainee, his claim instead "arises under the Due Process Clause of the Fourteenth Amendment, which is governed by an objective standard." *Kemp*, 27 F.4th at 495; *see Bell v. Wolfish*, 441 U.S. 520, 535 & n.16 (1979). To state a cognizable failure-to-protect claim under the Fourteenth Amendment, a pretrial detainee must show that the defendant's failure to protect him from a substantial risk of serious harm was "objectively unreasonable." *Kemp*, 27 F.4th at 497; *see Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). Put differently, he must show that the defendant "did not take reasonable available measures to abate the risk, even though a reasonable [official] in the circumstances would have appreciated the high degree of risk involved, making the consequences of . . . inaction obvious." *Thomas v. Dart*, 39 F.4th 835, 841 (7th Cir. 2022).

Both inquiries account for the unfortunate reality that prisons are dangerous places and "the 'general risks of violence in prison' confront virtually every detainee." *Id.* at 842–43. A defendant is not liable merely because he is aware of and fails to eliminate those risks. *See Brown v. Budz*, 398 F.3d 904, 913 (7th Cir. 2005). Rather, a plaintiff must show a "specific risk" that the defendant had notice of and, under the Fourteenth Amendment, failed to respond to in an objectively reasonable manner. *See Thomas*, 39 F.4th at 842–43. The risk can be based on the plaintiff's "particular vulnerability" or a particularly dangerous assailant. *Id.* at 843. And it can be a risk that stems from multiple sources or that multiple inmates face. *Farmer*, 511 U.S. at 843. But ultimately, "the risk must be somehow 'specific to a detainee, and not a mere general risk of violence.'" *Thomas*, 39 F.4th at 843.

Brown's claim lacks this key requirement. He does not assert that Dart or any

6

other prison official had notice that he faced a specific risk above and beyond the general risk of violence in the prison. Regarding the January incident, Brown testified in a deposition that his assailant had threatened him earlier, but he admitted that he did not tell "any Cook County staff" about those threats. Def.'s Stat. in Supp. of Mot. for Summ. J., Ex. 4 at 65:12–65:14. Regarding the May incident, Brown testified that he had requested and been denied protective custody one week before, but he does not provide the basis for that request or tie it to the assault. *See id.* at 165:16–167:19. To the contrary, he testified that he had just moved to a new tier—five days after his request was denied—and did not know anybody there at the time of the assault. *Id.* at 167:1–167:19. Moreover, he testified that, to his knowledge, none of the individuals involved in the May incident made any threats against him before the assault. *Id.* at 171:5–171:11.

Brown cannot satisfy the specific-risk requirement by pointing to the lapses in supervision that coincided with his injuries. It is possible, as Brown alleges, that inmates at Cook County Jail know when they are unsupervised and take advantage of that time to engage in "anti-social behaviors," including "physical and sexual violence." Compl. ¶ 14. It is also possible that *Monell* discovery may reveal that continuous supervision of Brown's tier would have reduced the likelihood of assault, or even that Brown would not have been assaulted if his tier remained supervised. But it is always the case that prison officials in theory could do something to better protect inmates, and a plaintiff can always assert that more guards, better training, or different protocols would have prevented his injury. If that sufficed to establish a specific risk, then the rule that constitutional violations "cannot be predicated merely on knowledge of general risks

7

of violence in prison" would be too easily circumvented.  *See Weiss v. Cooley*, 230 F.3d 1027, 1032 (7th Cir. 2000).

The evolution of Brown's theory in this case illustrates the point.  His complaint alleged that his injuries were caused by a policy or practice of cross-watching—permitting one prison officer to watch multiple tiers.  But that theory turned out to be mistaken; Castillo and Corbert were assigned only to his tier.  Now, he contends that having only one officer assigned to his tier was not enough.  He accepts that "it is not unlawful for corrections officers to assist other officers in need of assistance," but the problem, in his view, is that this "'back-up' practice . . . takes officers from tiers long enough that detainees can attack one another."  Pl.'s Opp'n to Mot. for Summ. J. at 9–10.

The same claim could be made however many officers were assigned to a tier, so long as the prison permitted them to leave if needed elsewhere.  And if the prison did not permit supervising officers to provide back-up, and an inmate elsewhere were injured because there were not enough officers present, the prison would no doubt face a claim challenging that policy too.  *Cf. McGill v. Duckworth*, 944 F.2d 344, 350–51 (7th Cir. 1991) (reasoning that a guard should not be liable for leaving his monitoring post to take another inmate to the hospital).  At that point, a claim based on prison policy is practically indistinguishable from a claim openly based on the general risk of violence in prisons.

The specific-risk requirement demands more.  It requires the defendant to have unreasonably failed to protect the plaintiff from a risk that is somehow particularized (even if not necessarily unique) to the plaintiff.  *See Thomas*, 39 F.4th at 843.  Merely

8

identifying one of the factors that makes prisons dangerous is not enough.

Brown also cannot avoid the specific-risk requirement by asserting a *Monell* claim against Dart instead of individual prison guards. Under *Monell*, a municipality or other local governmental body is a "person" that may be liable under section 1983 when its own acts cause a constitutional violation. *See Monell*, 436 U.S. at 690–94, 690 n.55; *Connick v. Thompson*, 563 U.S. 51, 60 (2011). But *Monell* claims require an underlying constitutional violation, and that is what Brown is missing. *See First Midwest Bank ex rel. LaPorta v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021). His claim effectively seeks to impose liability based on the general risks of violence in prison. That is not enough to establish a Fourteenth Amendment violation, whether the defendant who allegedly should have done more is an individual guard or a policymaker.

Two Seventh Circuit cases help frame the problem. In *Weiss v. Cooley*, plaintiff Weiss was charged with "the attempted murder, criminal confinement, and rape with a deadly weapon of a young African-American woman" in a widely publicized case that invoked heightened racial tensions. *Weiss*, 230 F.3d at 1029. Several inmates threatened and insulted Weiss on his way to his cell block, which was reserved for people accused of serious felonies. *Id.* at 1030. The officer accompanying Weiss, Officer Cooley, refused his request to put him in isolation, and Weiss was later assaulted. *Id.*

Weiss sued Officer Cooley, alleging that he was deliberately indifferent to the substantial risk of harm to Weiss. *Id.* at 1032. The Seventh Circuit held that Cooley was not entitled to summary judgment. *Id.* In its view, Weiss's claim against Cooley was not "predicated merely on knowledge of general risks of violence in prison." *Id.*

9

Rather, there was evidence that Cooley had notice of a "heightened risk" to Weiss based on his "knowledge of the victim's characteristics"—namely, the widely known and controversial charges he faced. *Id.*

Weiss also sued the sheriff and jail commander, alleging that their failure to "implement a proper classification system" exposed him to his assailant. *Id.* at 1033. Unlike with Cooley, the Seventh Circuit held that these defendants were entitled to summary judgment. *Id.* According to the Seventh Circuit, Weiss had to prove that they "knew that the probability that certain inmates would face extreme and unusual risks was so high that their failure to [adequately] classify inmates on such a basis amounted to deliberate indifference to the safety of the high-risk individuals." *Id.* Weiss's only theory of such unconstitutional motive, however, was that "circumstances in the community and the jail were such that assaults on prisoners like [him] were 'inevitable.'" *Id.* In the Seventh Circuit's view, that was not enough. *Id.*

The Seventh Circuit clarified why in *Brown v. Budz*. There, the plaintiff—a Caucasian resident at a detention facility—was assaulted by G.B., a resident with a history of attacking Caucasian residents. *Budz*, 398 F.3d at 907–08. He sued the facility's policymakers, among other defendants, alleging that they were aware of G.B.'s history but failed to take adequate measures to prevent the attacks. *Id.* at 908. The defendants argued that the plaintiff's claim was foreclosed by *Weiss*, but the Seventh Circuit disagreed. *Id.* at 909. It reasoned that "the policymaking defendants in *Weiss* were alleged to have had knowledge of only general risks of violence at their prison, as opposed to particular knowledge of a specific risk posed by, or to, a particular detainee." *Id.* In contrast, the defendants in *Budz* were "alleged to have been personally aware of

10

the specific threat G.B. posed to Caucasian residents . . . and to have failed to take adequate measures to neutralize that particular risk." *Id.* That difference was critical because, in the Seventh Circuit's words, "[a] failure to protect claim may sound against even a 'high-level' official so long as the averred risk is specific to a detainee, and not a mere general risk of violence." *Id.*

This case most resembles the claim against the *Weiss* policymakers that was dismissed. Unlike Weiss's claim against Officer Cooley, Brown does not assert that any official knew that he was particularly likely to be attacked. And unlike the claim in *Budz*, Brown does not assert that any official knew that his assailants posed a particular danger to him. Instead, his *Monell* claim asserts only that his injuries were caused by an inadequate supervision policy, akin to the allegedly inadequate inmate-classification system in *Weiss*. And as in *Weiss*, his claim relies solely on the idea that the existing policy was inadequate because "circumstances in the community and the jail were such that assaults on prisoners . . . were 'inevitable'" without a different policy. *Weiss*, 230 F.3d at 1033. That was not enough in *Weiss*, nor is it enough here. Brown cannot avoid the specific-risk requirement by recasting his claim to challenge an alleged defect in prison policy rather than an individual guard's conduct.

To be sure, *Weiss* held that such a theory was insufficient under the Eighth Amendment's subjective standard, whereas Brown's claim is governed by the Fourteenth Amendment's objective standard. But the difference between the standards does not change the outcome. Both standards require the existence of a substantial risk of harm. *See Thomas*, 39 F.4th at 842; *Farmer*, 511 U.S. at 837. And under both standards, the defendant is not liable if he acts reasonably. *See Estate of Wallmow v.*

11

*Oneida County*, 99 F.4th 385, 391 (7th Cir. 2024); *Farmer*, 511 U.S. at 844. The only difference—whether the defendant actually inferred the existence of a substantial risk or merely would have done so if he were reasonable—does not render *Weiss* inapplicable here. In *Budz*, the Seventh Circuit explained that the problem in *Weiss* was that the policymaking defendants "were alleged to have had knowledge of only general risks of violence at their prison, as opposed to particular knowledge of a specific risk posed by, or to, a particular detainee." *Budz*, 398 F.3d at 909. Whether the defendant actually knew or merely should have known of the risk was beside the point; what mattered was *what kind* of risk the defendants had notice of.

Here, as in *Weiss*, the alleged risk is not particularized enough. Brown's claim is essentially predicated on knowledge of the general risks in prisons, and that is not enough for a Fourteenth Amendment claim. Brown's requested *Monell* discovery might help him establish that the gaps in supervision are the result of a municipal policy or practice. It also might help him establish a pattern of inmate assaults correlated with gaps in supervision, and perhaps one that Dart had notice of. But none of that would establish the kind of particularized risk needed to sustain Brown's claim. Summary judgment is therefore appropriate.

## Conclusion

For the reasons stated above, the Court grants Dart's motion for partial summary judgment [dkt. 50]. The parties are directed to confer regarding what further steps are necessary to bring the case to a conclusion. A joint status report in this regard is to be filed by May 15, 2026. The case is set for a telephonic status hearing on May 22, 2026 at 9:05 a.m., using call-in number 650-479-3207, access code 2305-915-8729.

Date:  May 10, 2026

_____
MATTHEW F. KENNELLY
United States District Judge